IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| G&G CLOSED CIRCUIT EVENTS, LLC, | § | |
| as Broadcast Licensee of the May 6, 2017 | § | |
| Saul Alvarez v. Julio Cesar Chavez, Jr. Super | § | |
| Middleweight Championship Fight Program, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| 1) EL IMPRESARIO, INC., individually, and d/b/a | § | Civil Action No. 4:20-cv-01536 |
| O BAR HOUSTON and d/b/a O BAR | § | |
| DISCOTHEQUE and d/b/a O BAR and d/b/a EL | § | |
| KORRAL HOUSTON and d/b/a VIP LOUNGE; | § | |
| and | § | |
| 2) JAIME A. ORTEGA, individually, and d/b/a O | § | |
| BAR HOUSTON and d/b/a O BAR | § | |
| DISCOTHEQUE and d/b/a O BAR and d/b/a EL | § | |
| KORRAL HOUSTON and d/b/a VIP LOUNGE; | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Respectfully submitted,

David M. Diaz
State Bar No. 24012528
Southern District Bar No. 889588
david@diazlawtx.com
Attorney-in-charge

LAW OFFICES OF DAVID DIAZ, PLLC
825 Watters Creek Blvd.
Building M, Suite 250
Allen, Texas 75013
(972) 996-4588 – Telephone
(972) 996-4501 – Facsimile

ATTORNEY FOR PLAINTIFF

# TABLE OF CONTENTS

A.    INTRODUCTION ......................................................................................................... 1

B.    STATEMENT OF THE ISSUES TO BE DECIDED BY COURT ......................................... 2

C.    DEEMED ADMISSION .............................................................................................. 2

D.    PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE ..................................................... 3

E.    STATEMENT OF MATERIAL FACTS THAT
      DEMONSTRATE NO GENUINE ISSUES FOR TRIAL ................................................... 4

F.    ARGUMENTS & AUTHORITIES ................................................................................ 6

      1.   The Communications Act ........................................................................... 6

      2.   Plaintiff was the Sole Licensor of The Event to Commercial Establishments ........... 6

      3.   Section 605 Applies in this Case ................................................................. 7

      4.   Strict Liability Statute .............................................................................. 8

      5.   Proof of Strict Liability Elements ............................................................... 8

           (i)    The Event was shown in Defendants' Establishment
                  and broadcast to the patrons of Defendants' Establishment ......................... 8

           (ii)   Defendants exhibited the Event at Defendants'
                  Establishment without Plaintiff's Authorization ............................................ 9

      6.   Authorization from Anyone Other Than Plaintiff is Not Valid Authorization ........... 9

      7.   Vicarious Liability of Defendant Ortega .................................................. 10

      8.   Strict Liability as the TABC License Holders ......................................... 12

      9.   Statutory Damages under 47 U.S.C. § 605 ............................................ 14

      10.  Damages for Willful Act Under 47 U.S.C. § 605(e)(3)(C)(ii) .................... 16

      11.  Attorneys' Fees & Costs ......................................................................... 20

G.    CONCLUSION & PRAYER ...................................................................................... 20

TABLE OF AUTHORITIES

**CASES**

*American Television and Communications Corp. v. Floken, Ltd.,*
629 F. Supp. 1462 (M.D. Fla. 1986)................................................................15

*Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F. Supp. 1522 (S.D.N.Y. 1991) ..................14

*Cablevision Systems Corp. v. Maxie's North Shore Deli Corp.,*
1991 U.S. Dist LEXIS 4874 (E.D.N.Y. March 20, 1991) .............................................14

*In re Carney*, 258 F. 3d 415 (5th Cir. 2001) .....................................................3

*Entm't by J&J, Inc. v. Al-Waha Enterprises, Inc.,* 219 F. Supp. 2d 769 (S.D. Tex. 2002) ..........6

*Garden City Boxing Club, Inc, v. Guzman,*
2005 U.S. Dist. Lexis 7954 (S.D.N.Y. April 26, 2005).................................................19

*Garden City Boxing Club, Inc. v. Sacks,*
2008 U.S. Dist. LEXIS 30332 (S.D. Tex. Apr. 10, 2008) .............................................19

*Garden City Boxing Club, Inc. v. Vinson*,
2003 U.S. Dist. LEXIS 26180 (N.D. Tex. Sept. 3, 2003)................................................9

*Hulsey v. Texas*, 929 F.2d 168 (5th Cir. 1991) ..................................................3

*J&J Sports Productions, Inc. v. Boneheadz, Inc.,*
2011 U.S. Dist. LEXIS 153370 (W.D. Tex. Dec. 13, 2011) .........................................7-8

*J&J Sports Productions, Inc. v. Bustillos,*
2018 U.S. Dist. LEXIS 203136 (S.D. Tex. Nov. 30, 2018).............................................8

*J&J Sports Productions, Inc. v. Cindy's Gone Hog Wild, Inc.,*
2011 U.S. Dist. LEXIS 9750 (W.D. Tex. Aug. 29, 2011) .............................................11

*J&J Sports Productions, Inc. v. Enola Investments, LLC and Tiffaney Enola Small,*
2020 U.S. App. LEXIS 6184 (5th Cir. Feb. 28, 2020) ................................................7

*J&J Sports Productions, Inc. v. Garcia,*
2009 U.S. Dist. LEXIS 72233 (S.D. Tex. Aug. 14, 2009).............................................20

*J&J Sports Productions, Inc. v. Little Napoli, Inc.,*
2014 U.S. Dist. LEXIS 99032 (S.D. Tex. July 22, 2014).............................................7-8

*J&J Sports Productions, Inc. v. Marcos Rene Maidana Fight Program*,
  2019 U.S. Dist. LEXIS 65562 (W.D. Tex. April 16, 2019) ............................. 10

*J&J Sports Productions, Inc. v. Papagallos 1, Inc.*,
  Civil Action No. A-08-CA-691-SS (W.D. Tex. April 17, 2009) .................................. 19

*J&J Sports Productions, Inc. v. Perales*,
  Civil Action No. SA-08-CA-373-FB (W.D. Tex. Jan. 21, 2009) ................................. 19

*J&J Sports Productions, Inc. v. Villalobos*,
  2009 U.S. Dist. LEXIS 116345 (E.D. Cal. Dec. 15, 2009) ............................ 19

*Joe Hand Promotions, Inc. v. 152 Bronx, L.P.*, 11 F. Supp. 3d 747 (S.D. Tex. 2014) ............... 12

*Joe Hand Promotions, Inc. v. Bush*,
  2017 U.S. Dist. LEXIS 218105 (W.D. Tex. Oct. 27, 2017) ............................ 11

*Joe Hand Promotions, Inc. v. Carranza*,
  2009 U.S. Dist. LEXIS 109590 (E.D. Cal. Nov. 23, 2009) ............................ 19

*Joe Hand Promotions, Inc. v. Malespin*,
  2001 U.S. Dist. LEXIS 2037 (S.D.N.Y. Feb. 27, 2001) ................................ 17

*Joe Hand Promotions, Inc. v. Roberson Mgmt.*,
  2006 U.S. Dist. LEXIS 56237 (S.D. Tex. 2006) ............................................. 13

*Joe Hand Promotions, Inc. v. Texas 411 Corporation,* No.
  4:11-cv-02883 (S.D. Tex. December 13, 2012) ............................................. 10

*KingVision Pay per View, Ltd. v. Boom Town Saloon, Inc.*, 98 F. Supp. 2d 958 (N.D. Ill) ........ 14

*KingVision Pay-Per-View, Ltd. v. Hay Caramba Mexican Rest.*,
  Civil Action No. H-02-1311 (S.D. Tex. March 10, 2003) ............................ 19

*KingVision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438 (S.D.N.Y. 2001) ........ 17

*KingVision Pay-Per-View, Ltd. v. Quinnones*,
  2003 U.S. Dist. LEXIS 5907 (S.D. N.Y. April 3, 2003) ................................ 18

*Kingvision Pay-Per-View, Ltd. v. Soule Corp.*,
  2004 U.S. Dist. LEXIS 31775 (W.D. Tex. Oct. 22, 2004) ............................ 11

*KingVision Pay-Per-View, Ltd. v. Valles*,
  2001 U.S. Dist. LEXIS 24268 (W.D. Tex. March 30, 2001) ......................... 18

*KingVision Pay-Per-View, Ltd. v. Zalazar,*
    2009 U.S. Dist. LEXIS 71559 (S.D.N.Y. June 11, 2009)................................................ 19

*Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260 (5th Cir. 1978)...................................................... 5

*Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651 (1978) ...................................... 14

*ON/TV of Chicago v. Julien*, 763 F.2d 839 (7th Cir. 1985)........................................................ 17

*Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159 (D. Ma. 1986).................... 15

*Thomas v. Esquivel*, 959 F. Supp. 396 (N.D. Tex. 1997) ............................................................. 5

*Time Warner Cable v. Googies Luncheonette, Inc.,*
    77 F. Supp. 2d 485 (S.D.N.Y. 1999)................................................................................ 17

*Time Warner Cable of New York City v. Taco Rapido Restaurant,*
    988 F. Supp. 107 (E.D.N.Y. 1997) .................................................................................. 19

*United States v. Scott*, 783 F. Supp. 280 (N.D. Miss. 1992)................................................... 6, 14

*Van Woudenberg v. Gibson*, 211 F.3d 560 (10th Cir. 2000) ......................................................... 5

*Walker v. Blackwell*, 360 F.2d 66 (5th Cir. 1966) ........................................................................ 5

*Zuffa v. Trappey*, 2012 U.S. Dist. LEXIS 39375 (W.D. La. Mar. 22, 2012)............................. 11

## STATUTES

47 U.S.C. § 553...........................................................................................................1-2, 6, 18

47 U.S.C. § 605..................................................................................................1-2, 6, 14, 16, 18, 20

## RULES

Fed. R. Evid. 201(d)...................................................................................................................... 5

Fed. R. Civ. P. 36(a) ..................................................................................................................... 3

Fed. R. Civ. P. 56 .......................................................................................................................... 1

**<u>OTHER</u>**

Cable Communications Policy Act of 1984, House Report No. 98-934,
   1984 U.S.C.C.A.N. §§ 5-6, 4655, 4720 ........................................................................ 14

Cable Communications Policy Act of 1984, Pub. L. 98-549,
   1984 U.S.C.C.A.N. §§ 8, 4745, 4750 ........................................................................... 18

Trademark & Satellite Acts, Pub. L. No. 100-667,
   1988 U.S.C.C.A.N. (102 Stat.), 5577, 5658 ................................................................... 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| G&G CLOSED CIRCUIT EVENTS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-01536 |
| | § | |
| 1) EL IMPRESARIO, INC., individually, and d/b/a O | § | |
| BAR HOUSTON and d/b/a O BAR DISCOTHEQUE | § | |
| and d/b/a O BAR and d/b/a EL KORRAL | § | |
| HOUSTON and d/b/a VIP LOUNGE; *et al.* | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Pursuant to FED. R. CIV. P. 56, Plaintiff G&G Closed Circuit Events, LLC ("Plaintiff")

files this *Motion for Summary Judgment and Brief in Support* against Defendants (1) El

Impresario, Inc., individually, and d/b/a O Bar Houston and d/b/a O Bar Discotheque and d/b/a O

Bar and d/b/a El Korral Houston and d/b/a VIP Lounge; and (2) Jaime A. Ortega, individually,

and d/b/a O Bar Houston and d/b/a O Bar Discotheque and d/b/a O Bar and d/b/a El Korral

Houston and d/b/a VIP Lounge (collectively "Defendants").

A. INTRODUCTION

1.      This is an "Anti-Piracy" case involving the Federal Communication Act of 1934,

as amended (the "Communications Act"). The Communications Act combats against the piracy

of radio and television signals.  *See* 47 U.S.C. §§ 553[1] and 605.[2] In this case, Defendants

---

[1] 47 U.S.C. § 553 provides, *inter alia*, that:
No person shall intercept or receive or assist in intercepting or receiving any
communications service offered over a cable system, unless specifically authorized to do
so by a cable operator or as may otherwise be specifically authorized by law.

[2] 47 U.S.C. § 605 provides, *inter alia*, that:

illegally intercepted the closed-circuit telecast of the May 6, 2017 Saul Alvarez v. Julio Cesar

Chavez, Jr. Super Middleweight Championship Fight Program, including undercard or

preliminary bouts and commentary (the "Event") and exhibited the Event in Defendants'

commercial establishment named O Bar Houston (and also known as the O Bar Discotheque, O

Bar, El Korral Houston, and VIP Lounge) and located at 921 FM 1960 W., Houston, Texas

77090 (also commonly known as 921 Cypress Creek Parkway, Houston, Texas 77090) (the

"Establishment"), without authorization from Plaintiff and without paying the commercial

licensing fee to Plaintiff.

B.  STATEMENT OF THE ISSUES TO BE DECIDED BY COURT

Issue #1:     Whether Defendants violated the Federal Communications Act of 1934 for the
              unauthorized interception and broadcast of the Event, under either 47 U.S.C. § 553 or
              47 U.S.C. § 605.

Issue #2:     Whether Plaintiff is entitled to receive statutory damages and the amount of statutory
              damages to be awarded to Plaintiff against Defendants pursuant to 47 U.S.C. §§ 553 or
              605.

Issue #3:     Whether Plaintiff is entitled to receive additional damages and the amount of
              additional damages to be awarded to Plaintiff against Defendants for willfulness
              pursuant to 47 U.S.C. §§ 553 or 605.

Issue #4:     Whether Plaintiff is entitled to recover its attorney's fees and the amount of attorney's
              fees to be awarded to Plaintiff against Defendants, pursuant to 47 U.S.C. §§ 553 or
              605.

C.  DEEMED ADMISSIONS

2.     On October 23, 2020, Plaintiff served Defendants, by and through their attorney,

with discovery documents, specifically including: (1) *Plaintiff's First Requests for Admission to*

*Defendant El Impresario, Inc.;* (2) *Plaintiff's First Requests for Admission to Defendant Jaime A.*

---

> [n]o person not being authorized by the sender shall intercept any radio communication
> and divulge or publish the existence, contents, substance, purport, effect or meaning of
> such intercepted communication to any person.  No person not being entitled thereto shall
> receive or assist in receiving any interstate or foreign communication by radio and use
> such communication (or any information therein contained) for his own benefit or for the
> benefit of another not entitled thereto.

*Ortega;* (3) *Plaintiff's First Set of Interrogatories to Defendant El Impresario, Inc.;* (4) *Plaintiff's First Set of Interrogatories to Defendant Jaime A. Ortega*; and (5) *Plaintiff's First Requests for Production to Defendants. See* Exhibit "E" attached hereto.

3.      On November 18, 2020, Plaintiff and Defendants entered into an agreement to extend the deadline for Defendants to respond to Plaintiff discovery requests until December 18, 2020. *See id.* To date, Defendants have failed to respond, object, or assert any privileges to any of Plaintiff's discovery requests, specifically including the Requests for Admissions pursuant to Rule 36 of the Federal Rules of Civil Procedure. Consequently, Plaintiff's Requests for Admissions are ***automatically deemed admitted***. *See* FED. R. CIV. P. 36(a); *Hulsey v. Texas*, 929 F.2d 168, 177 (5th Cir. 1991) (stating that if a party fails to timely serve answers or objections to requests for admission, the matters in the requests are deemed admitted).

4.      Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, "specifies that 'admissions on file' can be an appropriate basis for summary judgment." *See In re Carney*, 258 F. 3d 415, 420 (5th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). In other words, requests for admissions that are deemed admitted because of a party's failure to respond, may form the basis of summary judgment on the merits. *See id*. at 419-421 & n.6.

### D.  PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE

5.      Plaintiff's motion for summary judgment is supported by its summary judgment evidence. Plaintiff's evidence presented in support of a Final Summary Judgment against Defendants is contained in the *Appendix* filed contemporaneously with this motion and includes, *inter alia*, the following: (1) *Affidavit of Thomas P. Riley* (Plaintiff's representative and custodian of records; (2) *Closed Circuit Television License Agreement*; (3) *Affidavit* of Kwasi English (Plaintiff's auditor/investigator), including photographs and video; (4) deemed

admissions by Defendant El Impresario, Inc.; and (5) deemed admissions by Defendant Jaime A. Ortega.

E. STATEMENT OF MATERIAL FACTS THAT DEMONSTRATE NO GENUINE ISSUES FOR TRIAL

6.     As mentioned in paragraphs 2-4 herein, Defendants failed to respond, object, or assert any privileges to any of Plaintiff's Requests for Admissions pursuant to Rule 36 of the Federal Rules of Civil Procedure. As a result, Plaintiff's Requests for Admissions are automatically deemed admitted. In addition to the deemed admissions, Plaintiff's motion for summary judgment is supported by additional summary judgment evidence identified in paragraph 5 herein and contained in the Appendix. Based on the evidence presented by Plaintiff, the following are material facts of record that Plaintiff contends establishes there is no genuine issues for trial and that support the granting of summary judgment in Plaintiff's favor:

- Plaintiff possessed the **<u>exclusive</u>** proprietary rights to exhibit and sublicense the right to exhibit the Event at closed circuit locations, such as theaters, arenas, clubs, lounges, restaurants and other commercial establishments throughout the State of Texas. *See* Exhibit "A" at ¶ 4; Exhibit "A-1".

- In Texas, the Event was legally available to commercial establishments only through an agreement with Plaintiff. *See* Exhibit "A" at ¶ 5; Exhibit "A-1".

- The transmission of the Event originated via satellite and was received and shown at Defendants' Establishment via satellite. *See* Exhibit "A" at ¶ 6; Exhibit "C" at Nos. 22, 24-25, 39; Exhibit "D" at Nos. 22, 24-25, 38, 39.

- Defendants' Establishment was a commercial establishment and open to the public on the date of the Event. *See* Exhibit "C" at Nos. 9-10; Exhibit "D" at Nos. 9-10.

- On the date of the Event, without authorization, Defendants intercepted and received or assisted in the interception and receipt of the transmission of the Event, and broadcast or assisted in the broadcast of the entire Event to the patrons of the Defendants' Establishment. On the night of the Event, Plaintiff's Auditor entered the Establishment and observed the Event being telecast to the patrons of the Defendants' Establishment on multiple televisions. *See* Exhibit "A" at ¶ 8; Exhibit "A-2"; Exhibit "F".

- The Event was shown and broadcast at Defendants' Establishment on the date of the Event. *See* Exhibit "C" at Nos. 7, 8, 11-13, 27, 59, 66; Exhibit "D" Nos. 7, 8, 11-13, 27, 65.

- Defendants willfully, intentionally, and knowingly exhibited and/or broadcast the Event at Defendants' Establishment.  *See* Exhibit "C" at Response Nos. 64-65; Exhibit "D" at Nos. 68-69.

- Defendants did not obtain permission or authorization from Plaintiff and did not enter into an agreement with Plaintiff or pay for a licensing fee to broadcast or exhibit the Event at the Establishment. *See* Exhibit "C" at Nos. 3-6, 14-16, 19, 79-81; Exhibit "D" at Nos. 3-6, 14-16, 19, 82-84, 86.

- The Event was received in the Establishment because Defendants employed some means to intercept or receive the Event other than paying Plaintiff for the right to receive and broadcast the Event. *See* Exhibit "C" at No. 43; Exhibit "D" at No. 41.

- Defendants were the owners and managers of the Establishment on the date of the Event. *See* Exhibit "C" at Nos. 45-46; Exhibit "D" at Nos. 42-43; *see also Defendants' Original Answer* [Doc. 9] at ¶¶ 2-3.[3]

- Defendants had the right and ability to control the activities of the Establishment and benefited financially from the Establishment's activities and profits on the date of the Event. *See* Exhibit "C" at Nos. 48-51, 61; Exhibit "D" at Nos. 52-54, 59, 67; *see also Defendants' Original Answer* [Doc. 9] at ¶¶ 2-3.

- On the date of the Event, Defendants were the owners of the alcohol and liquor license / permit issued for the Establishment. *See* Exhibit "C" at No. 47; Exhibit "D" at Nos. 45, 47, 49, 51, 55; *see also Defendants' Original Answer* [Doc. 9] at ¶¶ 2-3.

---

[3] Pursuant to FED. R. EVID. 201(d), Plaintiff requests that the Court take judicial notice of its file and all pleadings and papers filed in this action, including, but not limited to, *Plaintiff's Original Complaint* [Doc. 1] and *Defendants' Original Answer* [Doc. 9]. *See Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 (5th Cir. 1978) ("Courts are particularly apt to take notice of material in court files.") (citing WEINSTEIN & BERGER, WEINSTEIN'S EVIDENCE 48 (Supp. 1977)); *Walker v. Blackwell*, 360 F.2d 66, 71 (5th Cir. 1966) (Coleman, J., dissenting) ("It is elemental that we are entitled to take judicial notice of our own records and files."); *Thomas v. Esquivel*, 959 F. Supp. 396, 398 (N.D. Tex. 1997) (stating that the court can take judicial notice of its own records); *accord Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record.").

F. ARGUMENTS & AUTHORITIES

7.      THE COMMUNICATIONS ACT:  The unauthorized interception and broadcast of either satellite or cable transmissions violates 47 U.S.C. §§ 553 and 605.  Accordingly, all acts of unlawful interception, receipt and broadcast of the signal of the Event were in violation of the Federal Communications Act.  An opinion from the Southern District of Texas acknowledges the intent of Congress in trying to protect unauthorized telecasts:

> As an amendment and supplement to the Federal Communications Act, 'Congress enacted the Cable Communications Policy Act of 1984 to address 'a problem which is increasingly plaguing the cable industry—the theft of cable service.'  The legislative history associated with section 553 and the amendments to section 605 reveals [sic] that one of Congress's principal objectives was to discourage theft of cable services.  Thus, Congress enacted a variety of penalties and remedies to 'protect the revenue of television cable companies from unauthorized reception of their transmissions.'

*Entm't by J&J, Inc. v. Al-Waha Enterprises, Inc.*, 219 F. Supp. 2d 769, 773 (S.D. Tex. 2002) (citations omitted).

8.      In order to deter the unlawful use of communications such as the Event, Congress specifically designed the Communication Act to provide "both prosecutor[s] and civil plaintiffs [with] the legal tools they need to bring piracy under control." *See* Trademark & Satellite Acts, Pub.L. No. 100-667, 1988 U.S.C.C.A.N. (102 Stat.), 5577, 5658; *see also United States v. Scott*, 783 F. Supp. 280, 281 (N.D. Miss. 1992).  Therefore, the Communication Act includes severe penalties, both civil and criminal,[4] for those who intercept, receive and/or broadcast protected communications.  *See Scott*, 783 F. Supp. at 281.

9.      PLAINTIFF WAS THE SOLE LICENSOR OF THE EVENT TO COMMERCIAL ESTABLISHMENTS: In this case, Plaintiff is in the business of marketing and licensing commercial

---

[4]  The criminal penalties include fines and imprisonment.  *See* 47 U.S.C. §§ 553(b)(1) and (2); 47 U.S.C. § 605(e)(1) and (2).

exhibitions of pay-per-view prizefight events. *See* Exhibit "A" at ¶ 4. Plaintiff possessed the **exclusive** proprietary rights to exhibit and sublicense the right to exhibit the Event at commercial establishments. *See* Exhibit "A" ¶ 4; Exhibit "A-1". Through a licensing agreement with the promoter of the Event, Plaintiff was licensed to exhibit the Event at closed circuit locations, such as theaters, arenas, clubs, lounges, restaurants, bars, and other commercial establishments throughout the State of Texas. *See* Exhibit "A" at ¶ 4; Exhibit "A-1". In Texas, the Event was legally available to commercial establishments **only** through an agreement with Plaintiff. *See* Exhibit "A" at ¶ 5; Exhibit "A-1".

10.     On the date of the Event, Defendants' Establishment was a commercial establishment and was open to the public. *See* Exhibit "A-2"; Exhibit "C" at Nos. 9 and 10; Exhibit "D" at Nos. 9 and 10; Exhibit "F". Further, the Establishment was owned by Defendants on the date of the Event. *See* Exhibit "C" at Nos. 45-46; Exhibit "D" at Nos. 42-43.

11.     SECTION 605 APPLIES IN THIS CASE: The transmission of the Event originated via satellite. *See* Exhibit "A" at ¶ 6. Additionally, Defendants have admitted that the television programming for the Establishment was received via satellite. *See* Exhibit "C" at Nos. 22, 24-25, 39; Exhibit "D" at Nos. 22, 24-25, 38-39. Accordingly, Plaintiff moves for judgment under 47 U.S.C. § 605. *See J&J Sports Productions, Inc. v. Enola Investments, LLC and Tiffaney Enola Small*, 2020 U.S. App. LEXIS 6184, *5 (5th Cir. Feb. 28, 2020) (finding that § 605 applied after noting that the "only undisputed evidence is that the Fight was originally transmitted via satellite."); *J&J Sports Prods. v. Little Napoli, Inc.*, 2014 U.S. Dist. LEXIS 99032 at *5 (S.D. Tex. July 22, 2014) (stating section 605 is a strict liability statute and applies to unauthorized interceptions of signals through radio or satellite, but not cable communications); *J&J Sports Prods. v. Boneheadz, Inc.*, 2011 U.S. Dist. LEXIS 153370, at *6 (W.D. Tex. Dec. 13, 2011)

("The Federal Communications Act prohibits the unauthorized interception of radio and satellite transmissions. 47 U.S.C. § 605(a). Section 605 prohibits anyone unlawfully receiving such communications from divulging or publishing the information or transmission.").

12.     STRICT LIABILITY STATUTE:  The Communications Act is a strict liability statute and to establish liability Plaintiff is required to prove only two elements: (1) the Event was shown in Defendants' Establishment; and (2) the exhibition of the Event at Defendants' Establishment was not authorized by Plaintiff. *See J&J Sports Prods. v. Bustillos*, 2018 U.S. Dist. LEXIS 203136, at *6 (S.D. Tex. Nov. 30, 2018) (47 U.S.C. § 605 is a "strict liability statute"); *J&J Sports Prods. v. Little Napoli, Inc.*, 2014 U.S. Dist. LEXIS 99032 at *5 (S.D. Tex. July 22, 2014).

13.     PROOF OF STRICT LIABILITY ELEMENTS: Plaintiff's summary judgment evidence establishes that the Event was shown/broadcasted in Defendants' Establishment and that Defendants did not receive authorization to show the Event from Plaintiff; thus, violating the Communications Act. Plaintiff's summary judgment evidence establishes the following:

**(i)  The Event was shown in Defendants' Establishment
and broadcast to the patrons of Defendants' Establishment**

- Plaintiff's Auditor witnessed the Event being broadcast at Defendants' Establishment. *See* Exhibit "A-2".

- Plaintiff's Auditor took video footage of the Event being broadcast at Defendants' Establishment. *See* Exhibit "F".

- Defendants' have admitted that the commercial establishment seen in Plaintiff's Auditor's video and pictures is Defendants' Establishment. *See* Exhibit "C" at Nos. 69-70, Exhibit "D" at Nos. 72-74; Exhibit "F".

- Defendants' have admitted that the Event was shown and exhibited at the Establishment. *See* Exhibit "C" at Nos. 7-8, 11-13, 27, 59, 64-66; Exhibits "D" at Nos. 7-8, 11-13, 27, 65, 68-69.

**(ii)  Defendants exhibited the Event at**
**Defendants' Establishment without Plaintiff's Authorization**

- Defendants' did not receive permission from Plaintiff, did not receive authorization from Plaintiff, and did not enter into an agreement with Plaintiff to show the Event at the Defendants' Establishment. *See* Exhibit "C" at Nos. 5-6, 14-16, 79-81; Exhibit "D" at Nos. 5-6, 14-16, 82-84, 86.

- Defendants' did not pay Plaintiff a licensing fee in order to show the Event at the Establishment. *See* Exhibit "A" at ¶¶ 8-10; Exhibit "C" at Nos. 3, 4, and 19; Exhibit "D" at Nos. 3-4, 19.

- Plaintiff exclusively possessed the proprietary rights to exhibit and sublicense the right to exhibit the Event to commercial establishments. *See* Exhibit "A" at ¶ 4; Exhibit "A-1" (page 1).

- In Texas, the Event was legally available to commercial establishments only through an agreement with Plaintiff.  *See* Exhibit "A" at ¶ 5; Exhibit "A-1".

- Plaintiff did not authorize Defendants' to receive the Event. Because Defendants did not purchase the Event from Plaintiff and were not authorized to receive the Event, Plaintiff did not provide Defendants or Defendants' Establishment with any electronic decoding equipment, nor did Plaintiff provide Defendants or Defendants' Establishment with any satellite coordinates necessary to receive the signal to broadcast the Event. Plaintiff did not notify any cable or satellite provider providing service to Defendants' Establishment to unscramble the reception of the Event for the Establishment. *See* Exhibit "A" at ¶¶ 8-9.

14.    AUTHORIZATION FROM ANYONE OTHER THAN PLAINTIFF IS NOT VALID

AUTHORIZATION. "Authorization" from anyone else other than Plaintiff is not valid

authorization. Any and every unauthorized showing of a pay-per-view event is a violation of the

Communications Act, including a tape-delayed showing of the Event. *See:*

- *Garden City Boxing Club, Inc. v. Vinson*, 2003 U.S. Dist. LEXIS 26180 (N.D. Tex. Sept. 3, 2003) ("Defendant does not dispute that she broadcast the Lewis-Tyson fight to approximately 40 patrons at The Red Dog Saloon on June 8, 2002 without paying a licensing fee. Nevertheless, defendant maintains that her conduct did not violate section 605(a) because (1) she purchased the right to broadcast the fight from DirecTV; and (2) she did not charge an admission fee to her customers. (See Def. MSJ Resp. at 4).  Both arguments are without merit.  The fact that defendant may have purchased and lawfully received the Lewis-Tyson fight from DirecTV does not immunize her from liability for then broadcasting the event to patrons at her bar without obtaining authorization from plaintiff, the exclusive licensee." *See,*

*e.g.*, *KingVision Pay-Per-View, Ltd. v. Williams*, 1 F. Supp. 2d 1481, 1484 (S.D. Ga. 1998); *KingVision Pay-Per-View, Ltd. v. Julian Corp.*, 1996 U.S. Dist. LEXIS 12539, 1996 WL 496600 at *2 (N.D. Ill Aug. 29, 1996); *That's Entertainment, Inc. v. J.P.T., Inc.*, 843 F. Supp. 2d 995, 999-1000 (D. Md. 1993); *See also, National Satellite Sports, Inc. v. Eliadis, Inc.*, 65 F. Supp. 2d 662, 228-69 (N.D. Ohio 1999) *aff'd*, 253 F.3d 900 (6th Cir. 2001), *cert. denied sub nom*, *Time Warner Entertainment, L.P. v. National Satellite Sports, Inc.*, 534 U.S. 1156, 151 L.Ed.2d 1019, 122 S.Ct. 1127 (2002).

- *Joe Hand Promotions, Inc. v. Texas 411 Corporation,* No. 4:11-cv-02883, at p. 4, 8-9 (*Order*) [Doc. 31] (S.D. Tex. December 13, 2012) ("Defendants do not deny that the Event was shown at Copa Cabana, they contend that they did not illegally access the Event… Defendants contend that they cannot be held liable under the FCA because they did not illegally obtain the Event but that it was either obtained from an internet website for free… First, because the FCA is a strict liability statute, courts have recognized that any access of a protected communication, without the proper authorization is a violation. Therefore, Defendants' contention that the broadcast was accessed for free via the internet is of no legal import… Even assuming that Defendants did stream the video live from the internet, it is common knowledge that downloading or streaming materials from the internet does not ensure that the downloaded or streamed media is legally obtained.").

15. <span style="font-variant:small-caps">Vicarious Liability of Defendant Ortega</span>. Because of the strict liability nature of the Communications Act, officers, directors, members, and managers are held individually liable for the Communications Act violations under the theory of vicarious liability.

*See*:

- *J&J Sports Productions, Inc. v. Marcos Rene Maidana Fight Program*, 2019 U.S. Dist. LEXIS 65562, at *6-8 (W.D. Tex. April 16, 2019) ("[I]ndividuals may be held vicariously liable for a corporation's violation of the Communications Act. … The Court concludes the vicarious liability standard offered by Plaintiff is more congruent with the text and purpose of the Communications Act. As to the statute's text, § 605(a) prohibits any person from 'receiv[ing] or assist[ing] in receiving' unauthorized satellite communications and 'us[ing] such communications (or any information therein contained) for his own benefit or for the benefit of another.' 47 U.S.C. § 605(a). This language closely mirrors the standard for vicarious liability offered by Plaintiff, and it demonstrates that an individual who assists in a corporation's interception of communications and who benefits from the use of those communications violates § 605 even if those actions were taken on behalf of the corporation. As to the statute's purpose, the Communications Act was intended to 'proscribe the piracy of programming signals.' *United States v. Harrell*, 983 F.2d 36, 39 (5th Cir. 1993). This purpose would be undermined if the Court were to accept a standard of vicarious liability that shields individuals who engage in piracy

as part of their corporate responsibilities. Instead, the goal of preventing the piracy of copyright communications—like the goal of preventing the exploitation of other copyright materials—is best achieved by ascribing liability to anyone who can supervise the piracy and has a financial interest in exhibiting the pirated communications. The Court therefore joins a number of district courts in this Circuit by adopting the vicarious liability standard offered by Plaintiff. Accordingly, an individual may be found vicariously liable for a corporation's violation of § 605 if the plaintiff shows the individual had (1) the right and ability to supervise the interception and broadcast of the communications and (2) an obvious and direct financial interest in the interception and broadcast of the communications.") (internal citations omitted).

- *Joe Hand Promotions, Inc. v. Bush*, 2017 U.S. Dist. LEXIS 218105, at *5-6 (W.D. Tex. Oct. 27, 2017) ("Courts allow an individual to be held liable for a company's violation of § 605 if the individual had (1) the right and ability to supervise the unauthorized activities of the establishment in those activities and (2) an obvious and direct financial interest in those activities. District courts apply this test to determine individual liability even where the individual plaintiff is an officer of the corporate entity that owns the establishment where the violation occurred.").

- *J&J Sports Prods. v. Cindy's Gone Hog Wild, Inc.*, 2011 U.S. Dist. LEXIS 9750, at *5-6 (W.D. Tex. Aug. 29, 2011) (citations omitted) ("Defendant [alleges] she cannot be held personally liable… Unfortunately for Herman, however, the Communications Act clearly allows for individual liability if an individual has the right and ability to supervise the activities of the establishment. Defendants' answer admits Herman is an owner and manager of the establishment and "had a right and ability to supervise the activities of the establishment." Thus, this defense likewise fails.").

- *Kingvision Pay-Per-View, Ltd. v. Soule Corp.*, 2004 U.S. Dist. LEXIS 31775, at *1-2 (W.D. Tex. Oct. 22, 2004) ("The record before the Court reflects that both Defendants had the 'right and ability to supervise' the infringing activities and 'an obvious and direct financial interest in the exploitation of copyrighted materials.' …Both Defendants had a financial interest in the Club to the extent that they would both benefit from increased revenue by broadcasting the copyrighted work. Additionally, both had sufficient interest in the Club to establish their right and ability to supervise the infringing activities — [Soule] was a manager of the Club and an officer of the corporation owning the Club, while [Quintana] holds the alcohol licenses for the Club, which requires her to maintain exclusive occupancy and control of the Club under Texas law. See Tex. Alcoh. Bev. Code § 109.53").

- *Zuffa v. Trappey*, No. 11-0006, 2012 U.S. Dist. LEXIS 39375, at *13-14 (W.D. La. Mar. 22, 2012) ("By admitting that they are 'officers, directors, shareholders, and/or principals' of the Fieldhouse, Trappey and Babineaux concede the requisite control and financial interest necessary to establish their vicarious liability for the Fieldhouse's showing of the Broadcast.").

16.     Here, in this case, Defendant Ortega was an officer, director, and manager of Defendant El Impresario, Inc. *See* Exhibit "C" at Nos. 52-55; Exhibit "D" at Nos. 44, 46, 48, 50. Additionally, Defendant Ortega had a right and ability to supervise the activities of the Establishment and had an obvious and direct financial interest in the activities of the Establishment on the date of the event. *See* Exhibit "C" at Nos. 48-51, 61; Exhibit "D" at Nos. 52-54, 59, 67; *see also* Defendants' Answer at ¶¶ 2-3. Accordingly, Defendant Ortega is individually liable for the Communications Act violations under the theory of vicarious liability.

17.     STRICT LIABILITY AS THE TABC LICENSE HOLDERS. Defendants are also liable for the violations of the Communications Act because the violations occurred in an establishment subject to an alcohol license issued by the Texas Alcoholic Beverage Commission ("TABC"). Defendants have admitted that they were the owners and/or holders of the TABC alcohol license for the Establishment on the night of the Event. *See* Exhibit "C" at No. 47; Exhibit "D" at No. 55; *see also* Defendants' Answer at ¶¶ 2-3. Defendants also admitted that they did not designate any portion of the Establishment to be excluded from the licensed premises that is subject to the alcohol license and that no portion or area of the Establishment was excluded from the alcohol license. *See* Exhibit "C" at Nos. 62-63; Exhibit "D" at Nos. 56-57. Further, Defendants represented to the public that O Bar Houston is three-clubs-in-one and/or two-clubs-in-one together with El Korral Houston and/or VIP Lounge. *See* Exhibit "C" at No. 72.

18.     For these reasons, Defendants' exhibition of the Event in their Establishment, which was subject to an alcohol license issued by the TABC, makes Defendants liable as a matter of law. *See Joe Hand Promotions, Inc. v. 152 Bronx, L.P.*, 11 F. Supp. 3d 747, 754 (S.D. Tex. 2014) (Harmon, J.) ("[Defendant] has judicially admitted that it held the TABC liquor permit for the Establishment on the night of the Event, a fact that makes it responsible for the

illegal exhibition of the Event there."); *see also Joe Hand Promotions, Inc. v. Roberson Mgmt*.,

2006 U.S. Dist. LEXIS 56237, at *2-4 (S.D. Tex. 2006) (Ellison, J.):

> "Plaintiff now moves for summary judgment against Roberson.  In response, Roberson denies that it is the general partner of the partnership that owns Cabo or that it was in control over Cabo's televisions or employees on the day in question.  Plaintiff contends that Roberson is responsible for all activity on the premises or undertaken by Cabo employees, because Roberson is the holder of Cabo's liquor license.

> According to the Texas Alcoholic Beverage Code,

> [e]very permittee shall have and maintain exclusive occupancy and control of the entire licensed premises in every phase of the storage, distribution, possession, and transportation and sale of all alcoholic beverages purchased, stored or sold on the licensed premises.  Any device, scheme or plan which surrenders control of the employees, premises or business of the permittee to persons other than the permittee shall be unlawful.

> TEX. ALCO. BEV. CODE. ANN. § 109.53 (Vernon 2001).

> The Texas Court of Appeals has held that "the sole means for exempting any portion of a premises from the 'licensed premises'" is provided by § 11.49(b)(1) of the Code.  *Crosby v. State*, 696 S.W.2d 388, 390 (Tex. App. -- Dallas 1985, pet. granted), *rev'd and remanded on other grounds*, 750 S.W.2d 768 (Tex. Crim. App. 1987) (*en banc*). Section 11.49(b)(1), in turn, provides that, "*[s]ubject to the approval of the commission or the administrator . . .*, an applicant for a permit or license may designate a portion of the grounds, buildings, vehicles, and appurtenances to be excluded from the licensed premises." TEX. ALCO. BEV. CODE. ANN. § 11.49(b)(1) (Vernon 1979) (emphasis added).

> *If such a designation has been made and approved* as to the holder of a license or permit authorizing the sale of alcoholic beverages at retail or as to a private club registration permit, the sharing of space, employees, business facilities, and services with another business entity . . ., does not constitute a subterfuge or surrender of exclusive control in violation of Section 109.53 of this code . . . .

> *Id.* § 11.49(b)(2) (emphasis added).

> There is no evidence that Roberson designated any area of the Cabo as separate or received permission to do so from the licensing authority.  ***Accordingly, the Court finds that Roberson was responsible for all portions of the Cabo, including the televisions, and for the actions***

*of all of the Cabo's employees*.

(emphasis added).

19.  <u>STATUTORY DAMAGES UNDER 47 U.S.C. § 605</u>:  Plaintiff elects to receive statutory damages. *See* 47 U.S.C. § 605(e)(3)(C)(i)(II).[5] The sublicense fees which Plaintiff charges to an authorized commercial establishment are based upon specific market factors, including but not limited to the marquee value of the boxing participants, the method of delivery to the residential consumer, the capacity of the commercial establishment, and any guarantees required by the promoter.  Applying the courts' analysis from their decisions under the Copyright Act,[6] in the instant case, the lost income from the sale of the Event to Defendants' Establishment represents only a starting place for the determination of the amount of damages to which Plaintiff is entitled for the Defendants' wrongful acts. When Congress enacted the Statute, it was specifically cognizant of the problems of theft of various wire communications, including closed-circuit programming, such as the Event.[7] Moreover, according to Congress, these incidents threaten to undermine the satellite industry and adversely impact legitimate satellite dealers and satellite programmers who otherwise would be receiving payment for their programming or descrambling devices. *See, Scott*, 783 F. Supp. at 281 (*quoting* H. Rep. No. 98-934, *supra* 1984 U.S.C.C.A.N. at 4746).

---

[5] *See KingVision Pay per View, Ltd. v. Boom Town Saloon, Inc*., 98 F. Supp. 2d 958, 966 (N.D. Ill) (statutory damage scheme is intended to ensure that a plaintiff does not lack a damage remedy for a proven violation of the Cable Act in situations where damages may be difficult or impossible to quantify).

[6] Statutory damages under the Copyright Act should serve to compensate the copyright owners and to provide a detriment to would be infringers.  *See Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651, 657 (1978); *see also Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1544 (S.D.N.Y. 1991) (identifying factors to consider in determining a statutory damage award).

[7] *See* Cable Communications Policy Act of 1984, House Report No. 98-934, 1984 U.S.C.C.A.N. §§ 5-6, 4655, 4720; *see also Cablevision Systems Corp. v. Maxie's North Shore Deli Corp.*, No. CV 88-2834, 1991 U.S. Dist LEXIS 4874 (E.D.N.Y. March 20, 1991) ("This section [553] was meant to address the 'major problem' of theft of cable services.") (citing H.R. Rep., 934, 98th Cong., 2d Sess. 83 (1984)).

20.     In addition to the lost revenue which would have been derived from the delivery and exhibition of the Event to Defendants' Establishment and Defendants' patrons, Plaintiff should receive additional compensation as it has been deprived of the "value, benefits and profits derived" from the unauthorized broadcast of the Event to Defendants' Establishment and Defendants' patrons as well as the value of "business investment, business opportunities and goodwill."  *See American Television and Communications Corp. v. Floken, Ltd.,* 629 F. Supp. 1462, 1466 (M.D. Fla. 1986).

21.     The *Affidavit of Thomas P. Riley*, Exhibit "A," details the types of damages suffered by Plaintiff, including, among others: (1) the loss, and continued loss, of customers; and (2) loss of revenue through decreased purchases of sublicensing fees.  (Exhibit "A" at ¶¶ 12-13). Each patron of Defendants' Establishment is lost as a future patron of authorized broadcasts. But for the Defendants' unauthorized broadcast of the Event, all or some of the patrons of Defendants' Establishment would have become paying patrons and directly increased the fees paid to Plaintiff by its authorized commercial establishments.  Further, Plaintiff has suffered damage to its goodwill and reputation and loss of its right and ability to control and receive fees for the transmission of the Event.  (Exhibit "A" at ¶ 14).[8]

22.     When negotiating sublicense fees, Plaintiff generally represents to legitimate commercial establishments the locations of other authorized commercial establishments licensed to receive the programming. (*See* Exhibit "A" at ¶ 14). Therefore, when an unauthorized commercial establishment intercepts, receives and broadcasts closed-circuit programming, such as the Event, Plaintiff's reputation and goodwill suffers from what appears like a misrepresentation. (*See id.*) Plaintiff should receive compensation from Defendants for these

---

[8] *See also Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159, 1161 (D. Ma. 1986).

losses suffered. Furthermore, an incalculable element of damages is the ill-will and possible loss

of future business from legitimate commercial establishments which refuse to pay sublicense

fees because they cannot compete with unauthorized commercial establishments which steal

closed-circuit programming, such as the Event. (*See id.*).

23.     The continued viability of Plaintiff as a business concern depends upon the

willingness and ability of legitimate commercial establishments to pay sublicense fees for the

right to broadcast closed-circuit sports and entertainment programming, such as the Event.  (*See*

Exhibit "A" at ¶ 15).  If such programming is made available to the public for no fee at

unauthorized commercial establishments which have not purchased the right to broadcast such

programming, legitimate commercial establishments will find no reason to purchase the right to

legally broadcast this type of programming. (*See id.*).

24.     Plaintiff's legitimate business operations are being threatened by Defendants'

actions. If rampant theft of service is allowed to go unpunished and Plaintiff and similar

distributors of protected communications continue to suffer losses as a result of the theft, these

businesses could be forced to curtail distribution of this programming, thereby depriving the

people of the State of Texas of the ability to view these sports and entertainment events.

25.     Given the benefits which Defendants received from the broadcast of the Event

and given the additional damages which Plaintiff has suffered, it is fair and reasonable to assess

against Defendants and award to Plaintiff statutory damages in the amount of $10,000.00 against

Defendants for Defendants' violation of the Communications Act by the exhibition of the Event.

26.     DAMAGES FOR WILLFUL ACT UNDER 47 U.S.C. § 605(e)(3)(C)(ii).  As its second

basis for relief, Plaintiff requests damages pursuant to 47 U.S.C. § 605(e)(3)(c)(ii) because

Defendants' actions were willful and "for purposes of direct or indirect commercial advantage or

private financial gain." In *ON/TV of Chicago v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985), the Court of Appeals for the Seventh Circuit interpreted willful under the Statute as "disregard for the governing statute and an indifference to its requirements." *Id.* at 844 (*quoting TransWorld Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 (1985)). The Court may award additional damages of up to $100,000.00 violation under 47 U.S.C. § 605(e)(3)(C)(ii) and $50,000.00 under § 553(c)(3)(B) for each willful violation of the Communications Act.

27.     Because of the absence of any way in which Defendants could have "innocently" accessed the broadcast of the Event, it is apparent that Defendants specifically and willfully acted to illegally intercept the transmissions of the Event for Defendants' commercial advantage.[9]  Defendants knew that they were wrong to receive, intercept and divert the signal of the Event and to broadcast it in Defendants' Establishment. *See KingVision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001); *see also Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 490 (S.D.N.Y. 1999) (when finding willfulness the court stated, "there can be no doubt that the violations were willful and committed for purposes of commercial advantage and private gain. Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems"). Yet, in total disregard of the Communications Act, Defendants intercepted and received the transmission and broadcast it to the patrons of Defendants' Establishment. *See* Exhibit "C" at Nos. 64-65; Exhibit "D" at

---

[9] *See Joe Hand Promotions, Inc. v. Malespin*, 2001 U.S. Dist. LEXIS 2037, at *9-10 (S.D.N.Y. Feb. 27, 2001) ("The respective defendants elected not to enter into contracts with plaintiff to obtain the transmission of the Program.  Their only means of obtaining the Program, and to avoid paying the legal subscription rate for a commercial establishment, would be: (a) using an illegal descrambler in a satellite receiver; (b) using a pirate cable box; (c) registering their respective commercial establishments as residential sites rather than commercial; and (d) ordering the Program for their respective residences and moving their residential cable boxes to their commercial establishments. ***The Court finds that employing any one of these means to defraud plaintiff would be evidence of willfulness and would support an award of enhanced damages***.") (emphasis added).

Nos. 68-69. Accordingly, Defendants' actions were willful and intentional and Plaintiff is entitled to additional damages.[10]

28.    In the instant case, Defendants' actual knowledge that Defendants' acts were wrongful should be sufficient to demonstrate that Defendants' acts were willful. *See KingVision Pay-Per-View, Ltd. v. Valles*, 2001 U.S. Dist. LEXIS 24268, at *9 (W.D. Tex. March 30, 2001) (Briones, J.) ("While Defendants may not have been well-versed in the statutory restrictions on the unauthorized interception of satellite transmissions, the Court finds that there must have been some knowledge on the part of Defendants that such interception could not be had for free.").

29.    Regarding the second prong of the damages test under 47 U.S.C. §§ 553(c)(3)(B) and 605(e)(3)(C)(ii), it is patently obvious that Defendants' actions were "for the purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. §§ 553(c)(3)(B) and 605(e)(3)(C)(ii). As stated by Congress,

> [i]t is further intended that the term 'direct or indirect commercial advantage or private financial gain' be interpreted broadly by both the courts in deciding actions, and the Department of Justice in pursuing actions, under this section. Those who willfully violate subsection (a) and directly or indirectly enjoy commercial gain from those violations, may be reached.

CABLE COMMUNICATIONS POLICY ACT, P.L. 98-549, 5 U.S. Cong. News, '84 Bd. Vol.-8, 4745, 4750.

---

[10]   *See KingVision Pay-Per-View, Ltd. v. Quinnones*, 01 Civ. 0330 (AKH) (KNF), 2003 U.S. Dist. LEXIS 5907, at * 13 (S.D. N.Y. April 3, 2003) ("In order for the defendants to have received the closed-circuit broadcast, they had to have engaged in some deliberate act, such as modifying a device or using decoding equipment. Therefore, the defendant's conduct was willful. Further, while plaintiff did not submit proof that any of the defendants pirated other events, advertised the fight or charged a cover fee, its submissions establish that defendants' display of the boxing match was likely to have resulted in an increase in the number of patrons at each establishment, as well as an increase in sales of food, beverages and cigarettes.").

30.     Defendants' purpose and intent in exhibiting the Event was to secure a private financial gain and direct commercial advantage by misappropriating Plaintiff's licensed exhibitions and infringing upon Plaintiff's rights, while avoiding proper payment to Plaintiff.[11] Courts determining willfulness damages have considered the following factors, such as here, where Defendants:

- Charging a cover charge:  *See Kingvision Pay-Per-View, Ltd. v. Zalazar*, 2009 U.S. Dist. LEXIS 71559, at *14 (S.D.N.Y. June 11, 2009) (charging of a "cover charge" is evidence of willfulness and commercial advantage); *Garden City Boxing Club, Inc. v. Sacks*, 2008 U.S. Dist. LEXIS 30332, at *6-7 (S.D. Tex. Apr. 10, 2008) (Tagle, J.) ("The Event was rebroadcast to the bar's customers who paid a twenty dollar ($20) cover charge; therefore, this act of cable piracy was for the purpose of direct or indirect commercial advantage.").  *See* Exhibit "A-2"; Exhibit "C" at Nos. 28.

- Broadcasted the Event on multiple televisions:  *Cf. Time Warner Cable of New York City v. Taco Rapido Restaurant,* 988 F. Supp. 107, 111-112 (E.D.N.Y. 1997) (showing Event on multiple televisions is evidence of commercial advantage); *J&J Sports Productions, Inc. v. Perales*, Civil Action No. SA-08-CA-373-FB (W.D. Tex. Jan. 21, 2009) (Biery, J.) *Order Granting Plaintiff's Motion for Summary Judgment and Final Judgment* (event telecast to the patrons of defendant's establishment on three televisions, warranted imposition of additional damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii)). *See* Exhibit "A-2"; Exhibit "C" at No. 58; Exhibit "D" at No. 64.

- Showed the Event in an urban area:  Because Defendants' violation occurred in a relatively urban city, the violation had more than "minimal impact." *See Joe Hand Promotions, Inc. v. Carranza*, 2009 U.S. Dist. LEXIS 109590, at * 7 (E.D. Cal. Nov. 23, 2009) (Modesto, California, population over 200,000, is a "relatively urban city"); *J&J Sports Prods. v. Villalobos*, 2009 U.S. Dist. LEXIS 116345, at * 7 (E.D. Cal. Dec. 15, 2009) (Fresno, California, population over 495,000, is a "larger urban city.").  *See* Exhibit "A-2".

---

[11]  *See KingVision Pay-Per-View, Ltd. v. Hay Caramba Mexican Rest.*, Civil Action No. H-02-1311 (S.D. Tex. March 10, 2003) (Hoyt, J.) *Memorandum and Order* (Doc. 14) ("It is the Court's view that the defendant profited even if it did not charge a cover by selling food and beverages to the patrons who expected and did view the broadcast."); *J&J Sports Productions, Inc. v. Papagallos 1, Inc.*, Civil Action No. A-08-CA-691-SS (W.D. Tex. April 17, 2009) (Sparks, J.) *Order* (Doc. 13) ("The undisputed evidence establishes the Event was broadcast to paying customers of Defendant's commercial establishment and thus the violation was for commercial advantage or private gain."); *Garden City Boxing Club, Inc, v. Guzman*, 2005 U.S. Dist. Lexis 7954, at * 9 (S.D.N.Y. April 26, 2005) ("[The exhibition of the fight undoubtly generated commercial profits for the defendant.").

- Advertising the Event:  *See J&J Sports Productions, Inc. v. Garcia*, 2009 U.S. Dist. LEXIS 72233 at *12 (S.D. Tex. Aug. 14, 2009) (Harmon, J.) ("Defendant openly advertised the Event on a marquee outside its establishment which serves as evidence that the Event was shown for the purpose of commercial advantage or private financial gains."). *See* Exhibit "C" at Nos. 29-33; Exhibit "D" at Nos. 29-33.

31.     ATTORNEYS' FEES & COSTS. Plaintiff requests an award of attorneys' fees and costs pursuant to 605(e)(3)(B)(iii) and as provided in the *Affidavit of David M. Diaz* (*See* Exhibit "B"). Pursuant to Section 605(e)(3)(B)(iii), the award of attorney's fees and costs is mandatory. Plaintiff seeks an award of one third of the actual and additional damages awarded to Plaintiff for the prosecution of this action through the final judgment requested or, alternatively, an hourly attorney's fee award. *See* Exhibit "B". Plaintiff also seeks a contingent award of attorney's fees in the event certain post-trial, pre-appeal and appellate services, in the event such services are rendered and do not lead to the reversal of the Judgment as provided in the *Affidavit of David M. Diaz*. *See* Exhibit "B".

## G.  CONCLUSION & PRAYER

Plaintiff respectfully requests that the Court sign and cause to be entered a judgment for Plaintiff against Defendants, jointly and severally, awarding Plaintiff:

(1)     Statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II) from Defendants, jointly and severally, in the amount of $10,000.00;

(2)     Additional damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii) from Defendants, jointly and severally, in the amount of $50,000.00;

(3)     Attorney's fees from Defendants in the amount of one-third (1/3) of recovery, or alternatively the hourly time presented in the *Affidavit of David M. Diaz* (for prosecution of this case through summary judgment); along with attorneys' fees for post-trial and appellate services;

(4)     Costs and post-judgment interest at the highest lawful rate; and

(5)     Such other and further relief to which Plaintiff is entitled.

Respectfully submitted,

By _____

David M. Diaz
State Bar No. 24012528
Southern District Bar No. 889588
david@diazlawtx.com
Attorney-in-charge

LAW OFFICES OF DAVID DIAZ, PLLC
825 Watters Creek Blvd.
Building M, Suite 250
Allen, Texas 75013
(972) 996-4588 – Telephone

ATTORNEY FOR PLAINTIFF

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2021, I electronically filed this instrument with the Clerk of the Court of the United States District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent "Notice of Electronic Filing" to the following attorney of record by electronic means:

Clyde Burleson                                    VIA ECF
Clyde W. Burleson, P.C.
1533 W. Alabama, Ste. 100
Houston, Texas 77006

ATTORNEY FOR DEFENDANTS

By: _/s/_ _____

David M. Diaz